WILLIAM PARSONS & another *vs.* MANUFACTURERS' INSURANCE COMPANY.

It is not a deviation for a vessel insured " at and from Callao to the Chincha Islands and from thence to New York," to return, after loading at the Chincha Islands with guano, to Callao for a clearance, if such is the usage of trade, and no clearance can be obtained at the Chincha Islands.

Upon the issue of the seaworthiness of a vessel at a certain time, the question whether a vessel would be seaworthy with pumps in the condition in which hers were found to be on the completion of her voyage some months afterwards is immaterial.

A paper stating the repairs made on a vessel, and her condition at the time of the repairs, signed but not written by a shipbuilder's foreman, who testifies that from seeing his signature to it he believes and has no doubt that the facts were as there stated, but that he has no recollection of the facts or of having signed it, is not competent evidence of the facts stated therein.

At the trial of an action on a policy of insurance on a vessel, the master of the vessel may be asked what caused the vessel to leak, whether as a matter of opinion or of fact.

Where a vessel is not so injured as to be incapable of performing her voyage, and the cargo remains capable of delivery *in specie* at the port of destination, there is no loss of freight for which insurers on freight are liable, except in case of general average; but where the

cargo is so injured by perils of the sea as to become wholly worthless and incapable of being carried with safety to the vessel and the remaining cargo, and is therefore thrown overboard, there is a total loss of freight on that part.

A vessel laden with guano at the Chincha Islands, having stopped at Callao for a clearance, and then started on her homeward voyage, sprung a leak and put back to Callao in distress, when it was found that a part of the guano had been so damaged by sea water that it was utterly worthless and could not be kept on board with safety to the vessel, and, if it could have been landed, the cost of drying it would have been greater than its value when dried, and it was thrown overboard. The rest of the cargo was necessarily discharged in order to repair the vessel, a freight paid thereon, and it was transshipped by its owner into another vessel bound for a different port; and the first vessel, after being repaired, and by permission of the charterers, went back to the islands, and took in another cargo of guano under the original charter, which she delivered in safety at her port of destination. *Held*, that there was a total loss of freight of the guano thrown overboard, but no loss of freight on that transshipped. *Held, further*, that evidence that the course thus taken was the usual and prudent course for vessels in such a situation, and the testimony of an insurance broker that in adjustment of losses under these circumstances the usage had been to treat the voyage as one and the same, and the substituted cargo as if it were the original cargo landed and reshipped, and that before the date of the policy on the freight of this vessel he had adjusted losses in one case, and, he thought, in others, accordingly, were insufficient to prove a custom which could affect the rights of the parties; and that the going back to the islands, and taking in a cargo after the repairs of the vessel, must be treated as a new voyage and not as a resumption of the old one.

ACTION OF CONTRACT on a policy of insurance, dated December 13th 1854, for " $ 7500 on barque Arctic, and $ 7500 on freight of said vessel, at and from Callao to Chincha Islands, and at and from thence to New York, with liberty to stop at a port north of Cape Henry for advice, the assured paying a fair additional premium if such port is used."

After trial before *Hoar*, J., and verdict for the plaintiffs, the case was reserved for the consideration of the full court, and is stated in the opinion.

*C. B. Goodrich*, for the defendants.

*B. R. Curtis & S. L. Thorndike*, for the plaintiffs.

HOAR, J.* The voyage insured being "from Callao to the Chincha Islands, and from thence to New York," the vessel sailed from Callao to the Chincha Islands, and having there loaded with a cargo of guano, returned to Callao for a clearance; sailed from Callao for New York; and having afterward on the voyage encountered the peril against which she was in-

---

* BIGELOW, C. J. did not sit in this case.

sured, the question is, whether her going to Callao from the islands was a deviation which discharged the underwriters.

Mr. Arnould states the rule thus : " Where, by the usage of trade, it is customary, in the course of the voyage insured, to stop at interjacent ports, though lying out of the direct line from one terminus to the other, it will be no deviation to stop there, though no leave for that purpose be reserved by any express clause, because the stopping at such port is, in these cases, considered to be a regular part of the voyage insured, and as such to have been foreseen and contemplated by the parties to the policy." 1 Arnould Ins. 354. " The meaning of the contract of insurance for the voyage," says Chancellor Kent, " is that the voyage shall be performed with all safe, convenient and practicable expedition, and in the regular and customary track." 3 Kent Com. (6th ed.) 312. That underwriters are bound by a fixed usage of trade, and that to pursue the voyage insured in conformity with such usage is not a deviation, is established by numerous decisions. *Lowry* v. *Russell,* 8 Pick. 360. *Martin* v. *Delaware Ins. Co.* 2 Wash. C. C. 254. *Vos* v. *Robinson,* 9 Johns. 192. *Cormack* v. *Gladstone,* 11 East, 347. *Noble* v. *Kennoway,* 2 Doug. 510. *Salvador* v. *Hopkins,* 3 Bur. 1707. *Bond* v. *Gonsales,* 2 Salk. 445. *Pelly* v. *Royal Exchange Assurance Co.* 1 Bur. 348. *Kingston* v. *Knibbs,* 1 Campb. 508 note.

The Chincha Islands are a dependency of Peru, and the taking of cargoes of guano from them is a government monopoly. They are not a port of entry or clearance, and cargoes can only be taken by a permit to be procured at Callao, and a clearance can only be obtained at that port. It was therefore, in our judgment, clearly competent for the jury to find, upon the evidence submitted to them, that a voyage from Callao to New York included, by the usage of trade, the right to return to Callao for a clearance, and that there was no deviation. The evidence, in effect, had a tendency to show that the only legal and customary route from the Chincha Islands to New York was through the port of Callao.

We are of opinion that neither of the objections made by the

defendants to the admission or exclusion of evidence at the trial can be supported.

The question whether the vessel would be seaworthy, with pumps in the condition in which they were found after the completion of the voyage to New York, was objectionable, because it related to a state of facts too remote from that which was the principal subject of inquiry.

The rejection of a part of the testimony of Charles Green presents a question not so free from difficulty, but which, on careful consideration, we think was rightly decided. It appears by his deposition that he was the foreman of the shipbuilders who repaired the Arctic in New York, and had charge of the repairs. A paper, bearing date December 14th 1855, was shown to him, and annexed to the deposition. This paper, which is signed by the witness, but was not written by him, recites that the repairs on the barque were completed about the 10th of November 1855, and states the condition of the rudder case at the time the repairs were made. The witness deposes that he has no recollection of the condition of the rudder case, and no recollection of signing the paper, but that, from seeing his signature to it, he believes and has no doubt that the facts were as they are there stated. It appears therefore that his memory is not refreshed by looking at the paper. Nor does he remember that when he signed the paper he then remembered the facts which it recites, and knew them to be true. Nor is it a memorandum, made by himself in the ordinary course of business, which he knows was truly made, from any habit or rule to which he can testify — differing in that respect from the recent case of *Perkins* v. *Augusta Insurance & Banking Co.* 10 Gray, 312. We think therefore that he has really testified to nothing more than his inference from seeing his signature to the paper, and that this is not sufficient. The paper itself purports to have been made several weeks after the transactions to which it refers. It does not appear by whom it was made, nor whether the witness signed it upon the strength of his own recollections, or from his confidence in the veracity or accuracy of the person who prepared it. All that he says may be true, and yet he may

never have had any personal knowledge of the particular facts concerning which he is asked to testify.

The question to the master, " What caused the vessel to leak ? " if it involved a matter of opinion, was yet proper, because his nautical experience made his opinion on such a subject competent evidence. But the answer would rather imply that it was understood and answered as a question of fact, whether the water came in at the bows or the stern.

The principal remaining question, though novel to some extent in the particular application of the doctrines by which it must be determined, seems to us to be conclusively settled by decided cases. The material facts upon which it arises are these. The Arctic, having sailed from Callao to the Chincha Islands, and there received her cargo of guano, after returning to Callao for a clearance, sailed for New York on the 13th of January. She sprung a leak, which compelled her to return to Callao as a port of necessity, and was there repaired. Two hundred and eighty six and a quarter tons of guano had been so much damaged by the sea water, as to be in a semi-liquid state and utterly worthless, and could not be kept in the vessel consistently with its safety on the voyage. There was evidence tending to prove that the guano could not be landed at Callao; and if it could have been, that the cost of drying it would have been greater than its value when dried. It was thrown overboard. It was necessary to discharge the rest of the cargo in order to repair the vessel. By direction of the charterers of the vessel, who were the owners of the cargo, instead of being stored and reloaded, it was transshipped into another vessel bound for England. The Arctic received fifty cents a ton for freight on the part which was thus transshipped, and permission from the charterers to go to the islands after she was repaired, and take in another cargo of guano, under the original charter; which the evidence showed was the usual and prudent course for vessels in such a situation. She took a full cargo, in pursuance of this agreement, and delivered it safely in New York. A witness for the defendants testified that he had been many years an insurance broker, and in the

habit of adjusting losses; that in an adjustment of losses, where a guano cargo had been transshipped at Callao, the usage had been to treat the voyage as one and the same, and a substituted cargo as if it were the original cargo landed and reshipped. On cross examination, he testified that he had adjusted losses in such cases prior to December 1854, either in general average for jettison or as partial loss. He mentioned one case which he thought occurred before that date, and thought there were several other cases, but could not name them.

Upon these facts, we are of opinion that the plaintiffs are entitled to recover the freight of the guano which was thrown overboard, as upon a partial loss, and that they are not entitled to recover for a total loss. The principles and rules which lead to this result have been thoroughly discussed and fully stated in the cases of *Roux* v. *Salvador*, 3 Bing. N. C. 266, *Jordan* v. *Warren Ins. Co.* 1 Story R. 342; *Clark* v. *Massachusetts Fire & Marine Ins. Co.* 2 Pick. 104; *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595; *M' Gaw* v. *Ocean Ins. Co.* 23 Pick. 405; and *Lord* v. *Neptune Ins. Co.* 10 Gray, 109. The whole subject has been so elaborately reviewed and considered, especially by this court in the last two cases cited, that it will be sufficient to state very briefly the reasons of our decision.

An insurance on freight is a contract to indemnify the assured, if he should be prevented, by any of the perils insured against, from delivering the cargo and earning his freight. If the vessel, by reason of such peril, is wholly lost, or if the cargo is destroyed, in either case there is a total loss of freight. But if the vessel is not so injured as to be incapable of performing the voyage, and the cargo remains capable of delivery *in specie* at the port of destination, there is no loss of freight for which the insurers are liable, except in cases of general average.

The barque Arctic was not totally lost. She returned safely to the port of Callao, was there made seaworthy without any very extensive or costly repairs, went to the islands again for a new cargo, and delivered it safely in New York. Nor was there a total loss of the cargo. Except the part which was thrown overboard, it remained in its original condition, capable of being

discharged, stored, reshipped, and delivered *in specie* at the port of her original destination. The insurance on freight had attached to the voyage upon which the barque had entered, and the cargo which she had on board, at the time when she encountered the peril which caused her return to Callao. It was not on account of any peril insured against that she did not resume her voyage, with all the remainder of her cargo, after she was repaired; but in consequence of a voluntary agreement made with the charterers, wholly distinct from the contract, and independent of the interests, of the insurers on freight. As against those insurers, she had no right, after she was repaired, to do anything but to proceed on her voyage to New York. The fact that Callao, which was her port of necessity, was also her port of original departure on the voyage insured, would not alter the case. Although we have decided that a voyage from the Chincha Islands includes the right to touch at Callao for a clearance, such being the law and the usage, yet manifestly a voyage from Callao to New York does not include the passage to the Chinchas. If the voyage insured had been from Norfolk to Callao and the Chincha Islands, and thence to New York, it could not be supposed, if the vessel, when on her way to New York, should be compelled to put into Norfolk as a port of necessity, that this would be such a return to the point of starting as would authorize the repetition of the entire voyage. Yet the difference between the two cases would be a difference of distance only.

On the other hand, there was a total loss of freight upon that part of the cargo which was thrown overboard. The jury have found that it was worthless. While it is somewhat difficult to apply the rule so steadily adhered to by the courts of England and America — that the cargo must be destroyed *in specie* in order to cause a total loss of freight, and that mere diminution of value is not sufficient — to the case of such an article as guano, which is to be used for a manure only, yet when, as in this instance, the article, which is an article of commerce in a dry state, usually sold and transported in bags, has become reduced by the action of the salt water to a mere porridge, to be

removed only in vessels which will hold liquids, unsafe to carry because it would clog the pumps and render the vessel unseaworthy, which the authorities of the country would not permit to be landed, and is wholly without value, we think no violence is done to the rule by deciding that it is a case of total loss. *Dyson* v. *Rowcroft*, 3 Bos. & Pul. 474. The jettison, although in one sense voluntary, would not make it the subject of general average, because it had no contributory value. There is no obligation to pay for a worthless thing, because it is also pernicious.

The evidence offered by the defendants to show that, by usage, the going to the islands for a new cargo was considered as a continued prosecution of the original enterprise, and the new cargo a substitution for the cargo first taken, we think insufficient to affect the rights of the parties. It was a new voyage, and not the resumption of the old one at the point where it was interrupted. A compensation in the nature of a *pro rata* freight was in fact received for the part of the voyage which was performed. Whether a custom so peculiar, and applicable only to a particular kind of cargo at a single port, could be supported, and allowed to control the operation of a contract of insurance, is extremely questionable. But upon examination of the testimony, we find it entirely inadequate to show that, at the time the policy was made, there was a usage so well settled, and of so long continuance, that any presumption could arise that the parties contracted in reference to it. *Eager* v. *Atlas Ins. Co.* 14 Pick. 141.

The verdict for the plaintiffs is therefore to stand, and the case, according to the agreement of the parties, is to be sent to an assessor to determine the amount of the loss on the vessel, and of the contribution in general average to which the defendants are liable, if any; and to assess a partial loss on freight upon the guano which was thrown overboard as worthless, according to the finding of the jury.

*Judgment for the plaintiff accordingly.*